UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　vs.　　　　　　　　　　　　　　　　　　　:　　NO. 1:14-CR-321
　　　　　　　　　　　　　　　　　　　　　　　　:
TERRENCE BYRD,　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:

*M E M O R A N D U M*

*I.　　Introduction*

We are considering a motion to suppress filed by Defendant Terrence Byrd. (Doc. 28). Byrd was indicted on December 17, 2014, for distribution and possession with intent to distribute heroin, and possession of body armor. (Doc. 1). In his motion, Byrd challenges the validity of an automobile search and asks that we suppress the fruits of said search. For the following reasons, we will deny the motion.

*II.　　Background*

On September 17, 2014, at approximately 2:30 p.m.,[1] Terrence Byrd's girlfriend,[2] Latasha Reed, rented a grey Ford Fusion from the Avis Budget car rental facility in Wayne, NJ. (Govt's Ex. 1). Per the rental company's policy, all additional

---

1. The exact time of the car rental is disputed. The timestamp on the rental contract is 10:26 a.m., but Byrd testified that the vehicle was not picked up until the afternoon.

2. The exact nature of Byrd and Reed's relationship is also disputed. The parties agree that Reed is the mother of "most" of Byrd's children. (Doc. 43 at 110; Doc. 51 at 4). At one point, Byrd referred to her as a "friend," (Doc. 43 at 16), but later claimed that they were engaged. (Doc. 43 at 110).

drivers must be identified in the contract and must present their license for verification. (Doc. 47 at 4-5). Reed paid for the rental and was the only individual who signed the rental agreement. (Id.). Nevertheless, Byrd began driving the car immediately upon leaving the rental facility. (Doc. 43 at 112).

      Later that day, around 6:00 p.m., Pennsylvania State Police Trooper David Long was monitoring traffic along Interstate 81 in Harrisburg when he noticed a grey rental vehicle being driven suspiciously. (Doc. 43 at 10). Byrd, the operator of the vehicle, was driving with his hands in the 10:00 and 2:00 position, and his seat was reclined so that he was not clearly visible through the driver's side window.[3] (Id. at 11). Although these are not violations of the Motor Vehicle Code, Trooper Long's suspicion was aroused, so he pulled out from his stationary location and began to follow the vehicle. (Id. at 12). After witnessing Byrd drive in the left lane for some time without overtaking any vehicles in the right lane (a so-called "left lane violation"),[4] Trooper Long initiated a traffic stop. (Id. at 12-13). When Long approached the vehicle, he noticed that Byrd was the only occupant and that he was extremely nervous. (Id. at 15). Long asked to see a copy of the rental agreement and Byrd's driver's license. Byrd explained that he did not have his license because he had washed it, and provided an interim license that did not have a photo identification. (Doc. 43 at 16). After searching for a short time, Byrd also produced the rental agreement, and explained that his "friend" had

---

3. The trooper referred to this as driving behind "the B pillar." (Doc. 43 at 10).

4. This is a violation of 75 Pa C.S. § 3313(d)(1).

2

rented the vehicle. (Id.). When Long returned to his own vehicle, he noted that the sun was causing an unsafe glare on their location, so he asked Byrd to move the traffic stop to a different location. (Id. at 18). Once in the new location, Long ran Byrd's name, date of birth, and license number through his computer, but received results for an individual named James Carter. (Id. at 18). At this time, Long's partner, Trooper Martin, arrived and the two of them began to sort out Byrd's identity. They discovered that Byrd was wanted on an active warrant in New Jersey for a parole violation. (Id. at 20). The troopers placed a call to determine whether New Jersey would extradite for the parole violation. (Id.). They also checked Byrd's criminal history, which revealed prior charges for weapons and drug violations, and assault. (Doc. 43 at 21). After approximately 35 minutes, the troopers confirmed that "James Carter" was an alias, that Terrence Byrd was the defendant's true name, and that New Jersey would not extradite for the warrant. (Id. at 22).

      The troopers returned to Byrd and asked him to step out of the car. (Doc. 43 at 22). By this time, Byrd was extremely nervous, "not able to stand still[,] . . . [and was] dancing back and forth, pacing back and forth . . . ." (Id. at 23). The troopers asked Byrd about the warrant and the alias, and explained the reason for the delay. They also asked if there was anything illegal in the car, and asked to see Byrd's tongue. (Id.). Byrd showed the troopers his tongue and stated that he had smoked a "blunt"[5] in the vehicle.

---

5. Defendant claims for the first time in his brief that the "blunt" he was referring to was a "Philly Blunt cigar" and that the troopers misunderstood him to mean that he had smoked a marijuana cigarette. (Doc. 54 at 23). However, neither the troopers nor Defendant testified to this fact at the suppression hearing.

3

(Doc. 34-9 at 8). The troopers asked for permission to search the car, but told Byrd that because the car was a rental and Byrd's name was not on the agreement they did not need his permission to search. (Doc. 43 at 82). At first, Byrd offered to get the blunt himself, which the troopers refused. Eventually, Byrd consented to the search. (Id. at 24). While Long was searching the car, Byrd admitted to Martin that he had recently used cocaine. Shortly thereafter, Trooper Swope, an off-duty Pennsylvania State Trooper, stopped to see if Long and Martin needed back-up. When the troopers opened the car's trunk they found a bulletproof vest. (Id. at 25). Martin then told Byrd that he was going to detain him, at which point Byrd began to run. Trooper Swope took Byrd into custody after a short chase. Byrd then admitted that there was heroin in the car. (Id. at 26).

III.     *Discussion*

    *A. Standing to Contest the Search*

The Third Circuit has clearly instructed that, generally, unauthorized drivers of rental vehicles lack standing to challenge a search thereof. See United States v. Kennedy, 638 F.3d 159, 165 (3d Cir. 2011) ("[A]s a general rule, the driver of a rental car who has been lent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy."). This general rule can be overcome by "extraordinary circumstances," such as where the unauthorized driver is "also the husband of the woman who had rented the car four days earlier and

had . . . 'personally contacted the rental car company . . . and reserved the vehicle in his name, using his own credit card, which was billed for the rental.'" Id. at 167 (quoting United States v. Smith, 263 F.3d 571 (6th Cir. 2001)). In Kennedy, the Third Circuit explained, none of these additional factors were present; the defendant was simply granted permission to use the car by the renter, and therefore, he had no expectation of privacy in the car. Id. at 168. The instant situation is identical to that presented in Kennedy. Byrd was merely given permission by Reed to drive the car–he was not a party to the rental agreement and he did not pay for the rental. Byrd's assertions that he "had an expectation of privacy . . . [because] [a]ny other finding[ ] ignores the real world reality that people of limited means cannot afford to add the extra driver to the contract . . ." and that "[a]n expectation of privacy should not be dependent on a defendant's pocket book . . . [,]" are both unavailing and inaccurate under established Fourth Amendment jurisprudence. Because Byrd had no expectation of privacy in the vehicle, and thus no standing to challenge the search, his motion will be denied.

*B. The Traffic Stop*

Even if we could find that extraordinary circumstances exist to bestow an expectation of privacy upon Byrd, we nevertheless find that the traffic stop and ensuing search were lawful. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable unless an exception to the warrant requirement applies. Horton v. California, 496 U.S. 128, 133 (1990). One such exception is the Terry stop. Under Terry, an officer may

conduct "a brief investigatory stop when he or she has a reasonable articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "'[I]n a traffic-stop setting, the first Terry condition–a lawful investigatory stop–is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a particular vehicular violation.'" United States v. Kennedy, No. 13-240, 2014 U.S. Dist. LEXIS 159802, at *24 (3d Cir. Nov. 13, 2014) (quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). If a police officer observes an individual commit a traffic violation, he or she is permitted to stop that vehicle. See United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004) (citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1997) ("A police officer who observed a violation of state traffic laws may lawfully stop the car committing the violation.")).

    Byrd argues that Trooper Long stopped him because he was driving with his seat reclined and his hands in the 10:00 and 2:00 positions on the wheel. (Doc. 29 at 3). Byrd contends that because neither of these things constitute a traffic violation, the stop and resulting search was illegal. However, Long testified during the preliminary hearing, and again at the suppression hearing, that he stopped Byrd because he was driving in the left lane without overtaking any vehicles in the right lane, a violation of 75 Pa. C.S. § 3313(d). (Doc. 43 at 13). Because Long personally witnessed the violation, he had cause to initiate the traffic stop. Accordingly, the stop itself was lawful.[6]

---

6. The majority of Defendant's 30-page supplemental brief (Doc. 54)–which the court authorized so that the parties could address the issue of standing–was dedicated to Defendant's claim that he should not have been stopped for the left lane violation in the first place. Defendant insists that he was not impeding traffic and that the video from the trooper's dash camera clearly demonstrates this fact. However, Trooper Long

*C. The Search*

"Upon making a lawful traffic stop of a vehicle, police officers are granted the authority 'to detain the automobile and its occupants pending an inquiry into a vehicular violation.'" Kennedy, supra at *26 (quoting Johnson, 555 U.S. at 327). In particular, officers have the discretion to: "(1) order the driver and passengers to get out of the vehicle; or (2) remain in the vehicle while the officers investigate the violation." Bonner, 363 F.3d at 216. "Once a valid traffic stop is initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of the inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012).

To determine whether the post-stop search is lawful, we employ a two-part analysis. First, we examine whether the officer was "aware of specific and articulable facts which gave rise to reasonable suspicion under the totality of the circumstances[.]" Kennedy, supra at *28 (citing United States v. Davis, 430 F.3d 345, 353 (6th Cir. 2005)). Reasonable suspicion "can be established with information that is different in quantity or content than that required for probable cause." United States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006). According to the Third Circuit:

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," information from sources that prove to be reliable, and information

---

testified repeatedly at the suppression hearing that the violation that formed the basis of the stop was not captured on the video. (Doc. 43 at 42, 44-45). We will credit the trooper's testimony.

>   from sources that–while unknown to the police–prove by the accuracy
>   and intimacy of the information provided to be reliable at least as to
>   the details contained within that tip.

United States v. Brown, 448 F.3d 239, 247 (3d Cir. 2006).  In particular, "the Court must defer to the 'officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed.'" Kennedy, supra at *29 (quoting United States v. Robertson, 305 F.3d 164, 166 (3d Cir. 2002)).

Second, we determine whether "the degree of intrusion [was] reasonably related in scope to the situation at hand given [the officer's] suspicions and surrounding circumstances[.]" Id. at *28.  To do this, we look to the totality of the circumstances surrounding the stop.  See id. at *29-30.  "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 135 S. Ct 1609, 1615 (2015).  "An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration." Arizona v. Johnson, 555 U.S. 323, 325 (2009).

In this case, when Long approached Byrd's vehicle, he noted that Byrd was "visibly nervous[,]" "shaking[,]" and had a difficult time obtaining his identification.  (Doc. 29-1 at 5).  Byrd could not produce a government-issued photo ID, and was driving a

8

vehicle rented in someone else's name.  In addition to an active arrest warrant, Byrd had a criminal history involving drugs and weapons, and had used an alias in the past.  All of these factors together constitute reasonable suspicion that Byrd was engaging in some type of criminal activity.  Long's brief questions regarding whether there was anything illegal in the car–which took approximately two minutes out of the entire 50-minute encounter–did not "measurably extend" the stop.  His inquiries were reasonably related in scope to the situation at hand.  Accordingly, the stop and resulting search were lawful.

*IV.*        *Conclusion*

For the reasons above, Defendant's motion will be denied.  We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge
