# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 1:14-CR-321 |
|---|---|---|
| v. | : | (Chief Judge Conner) |
| TERRENCE BYRD (1), | : | |
| Defendant | : | |

## MEMORANDUM

Defendant Terrence Byrd ("Byrd") moves the court to suppress all evidence obtained subsequent to a traffic stop conducted on September 17, 2014. (Doc. 28). The court will deny Byrd's motion.

## I. Findings of Fact[1]

Trooper David Long ("Trooper Long") is a Pennsylvania State Police trooper assigned to the Bureau of Criminal Investigation, Shield Unit. (6/30/15 Tr. 7:17-8:5). On the evening of September 17, 2014, Trooper Long was stationed in his unmarked patrol car on the median of Interstate 81 when he witnessed a gray rental vehicle traveling southbound.[2] (Id. at 8:21-9:14, 10:19-22; see Def. Ex. 3). The driver was sitting far back "behind the middle pillar" of the vehicle such that Trooper Long

---

[1] The above factual narrative derives from testimonial evidence adduced during two suppression hearings in this matter, together with exhibits submitted by the parties. The court reporter has provided the court with transcripts of the June 30 and July 8, 2015 suppression hearings. (Docs. 43, 47). Citations thereto are abbreviated as "6/30/15 Tr." and "7/8/15 Tr.," respectively. Citations to hearing exhibits are abbreviated as "Gov't Ex." and "Def. Ex."

[2] Trooper Long testified that rental vehicles, including Byrd's, are identifiable by the presence of bar codes "in the back corners of the windows" which are scanned before the vehicle departs the rental facility. (Id. at 11:6-15).

could see only the driver's hands at the ten and two positions. (6/30/15 Tr. 10:22-11:2, 11:16-22). The driver's unusual posture drew Trooper Long's attention and he began following the rental vehicle in the left lane. (Id. at 12:1-8, 37:13-16).

There were multiple vehicles in the left lane both in front of the rental vehicle and between the rental vehicle and Trooper Long's unmarked patrol car. (See id. at 12:4-8, 37:13-38:3, 38:24-39:3). Over the course of about two miles, these vehicles moved from the left lane to the right lane until the rental vehicle became the "lead vehicle" in the left lane. (Id. at 12:9-13:2). The driver of the rental vehicle made no attempt to merge back into the right lane after overtaking the last vehicle therein. (Id. at 13:3-11; Def. Ex. 7 at 2). Trooper Long testified that the driver's failure to reenter the right lane absent any traffic pattern preventing such a maneuver—*e.g.*, an entrance ramp funneling new traffic into the right lane—constituted a "left lane violation." (6/30/15 Tr. 13:12-14:19, 56:10-12). Trooper Long initiated a traffic stop intending to issue a warning to the driver of the rental vehicle. (Id. at 14:20-15:1).

As he approached the rental vehicle, Trooper Long observed "extreme nervousness" from the driver (eventually identified as Byrd) including shaking hands and visible sweating. (Id. at 15:2-6, 15:20-23; Def. Ex. 7 at 2). Byrd disputed the basis for the stop but then provided, at Trooper Long's request, the rental agreement and an interim New York driver's license without a photograph.[3] (6/30/15 Tr. 15:23-16:16; Def. Ex. 7 at 2; Def. Ex. 11 at 18:12:45-18:15:55; Def. Ex. 13). Byrd initially struggled to locate the rental agreement, and Trooper Long noticed

---

[3] Byrd explained that his actual driver's license had been damaged in a washing machine. (6/30/15 Tr. 16:17-20, 17:5-7).

2

Byrd "reach[] at the center console two or three times" and "pull[] away from it as if he didn't want to open it." (6/30/15 Tr. 16:21-17:5; Def. Ex. 11 at 18:13:35-18:15:55, 18:22:30-18:22:50). As Byrd searched for the agreement, Trooper Long asked him some questions. (See Def. Ex. 11 at 18:15:14-18:15:55). Byrd explained that he was traveling to Pittsburgh where he had been relocated for work and his pregnant girlfriend lived. (Def. Ex. 11 at 18:15:14-18:15:55, 18:20:35-18:21:22; Def. Ex. 7 at 2; 6/30/15 Tr. 111:14-17).

Byrd produced the rental agreement and informed Trooper Long that "he was not the renter and a friend rented the vehicle." (6/30/15 Tr. 16:6-12). The rental agreement identified Latasha Reed as the person who rented the vehicle and the sole authorized driver. (Gov't Ex. 1 at 1; see also 6/30/15 Tr. 109:24-110:2; 7/8/15 Tr. 7:20-9:1). Latasha Reed is the mother of several of Byrd's children. (6/30/15 Tr. 110:2-7). Byrd is not listed on the rental agreement, nor did he sign it. (Id. at 113:6-115:7; 7/8/15 Tr. 9:2-10, 9:25-10:7).

At Trooper Long's suggestion, Byrd and Trooper Long moved their vehicles to a safer location along the highway. (6/30/15 Tr. 17:23-18:14; Def. Ex. 11 at 18:18:05-18:20:10). Trooper Long ran Byrd's name, date of birth, and license number, and the system returned the name "James Carter." (6/30/15 Tr. 18:15-19:7). Pennsylvania State Police Trooper Travis Martin ("Trooper Martin") arrived at the scene in his marked patrol vehicle. (Id. at 9:6-10, 19:11-12, 19:24-20:2). The troopers continued running Byrd's information through various law enforcement databases and discovered "James Carter" had an outstanding New Jersey warrant for a probation violation. (Id. at 20:5-17, 21:7-9, 58:16-21; Def. Ex. 11 at 18:20:25-18:20:35,

3

18:22:05-18:22:30). The warrant, however, was "limited extradition," and the traffic stop had occurred outside the extradition area. (6/30/15 Tr. 20:17-19). The troopers also learned that Byrd's criminal history included "convictions or charges for weapons violations, assault on police, drug charges, assault charges, [and] domestic charges." (Id. at 21:14-21; see Def. Ex. 11 at 18:21:40-18:22:02).

As the troopers were reviewing the warrant and criminal history information, Byrd signaled for Trooper Martin to return to the car. (6/30/15 Tr. 60:1-6, 100:18-25; Def. Ex. 11 at 18:23:23-18:23:35). According to Trooper Martin, Byrd was "obsessed" with providing the troopers with his proper driver's license information despite already turning over the interim license. (Def. Ex. 11 at 18:28:30-18:28:38, 18:33:00-18:33:10). Byrd gave Trooper Martin his driver's license number, (6/30/15 Tr. 101:3-17), and shared more about his move to Pittsburgh, (Def. Ex. 11 at 18:28:30-18:28:53, 18:29:03-18:29:18; 6/30/15 Tr. 102:4-10). Trooper Martin stated that Byrd was shaking, smoking a cigarette, and would not make eye contact. (Def. Ex. 11 at 18:28:53-18:29:30; 6/30/15 Tr. 101:18-102:3). Trooper Long testified that the confusion over Byrd's identity prolonged the traffic stop. (6/30/15 Tr. 22:3-13). The troopers struggled to determine whether the driver was Byrd or "James Carter." (Def. Ex. 11 at 18:29:30-18:29:50, 18:30:50-18:49:15; 6/30/15 Tr. 102:24-103:4). In the patrol car, the troopers discussed Byrd's abnormal behavior regarding his driver's license and the center console, his physical signs of extreme nervousness, and the possibility that Byrd possessed marijuana in the center console. (Def. Ex. 11 at 18:32:00-18:32:35, 18:38:18-18:38:32, 18:41:30-18:42:00).

4

After confirming that Byrd and "James Carter" were the same person, the troopers approached the rental vehicle and asked Byrd to exit. (6/30/15 Tr. 22:7-11; Def. Ex. 11 at 18:50:02-18:50:20). Trooper Long provided Byrd with a written warning for the left lane violation, apologized for the length of the stop, and explained to Byrd that he had an outstanding warrant in New Jersey. (See 6/30/15 Tr. 22:11-25, 103:19-104:1; Def. Ex. 11 at 18:51:00-18:51:57). Trooper Long also informed Byrd that he was not authorized to drive the rental vehicle under the rental agreement. (Def. Ex. 11 at 18:52:50-18:53:02). Because he suspected criminal activity, Trooper Long asked Byrd if there was anything illegal in the vehicle, including marijuana, and for consent to search same. (6/30/15 Tr. 23:6-12; Def. Ex. 11 at 18:53:02-18:53:42). Trooper Martin specifically asked about the contents of the vehicle's center console. (Def. Ex. 11 at 18:53:00-18:53:15). Byrd responded: "I think I got a blunt . . .,"[4] which Trooper Long understood to mean a "smoked marijuana cigarette." (6/30/15 Tr. 23:13-17, 104:17-25; Def. Ex. 11 at 18:53:45-18:53:56). In offering to retrieve the blunt for the troopers, Byrd appears to state that "it's right there on the side." (Def. Ex. 11 at 18:54:50-18:54:59).

When asked if Byrd ever consented to a search of the vehicle, Trooper Long replied: "I believe he said, yes, but then he wanted to get – he said yes, I'll get [the blunt] for you. We told him we'd get it." (6/30/15 Tr. 93:3-8; see also id. at 23:14-15, 24:7-9; Def. Ex. 11 at 18:54:45-18:54:54). Trooper Long initially testified that Byrd asked the troopers several times if they wanted to search the vehicle and eventually

---

[4] The end of this statement is inaudible. (See id. at 18:53:45-18:53:56).

5

said "yeah, you can search the vehicle," (6/30/15 Tr. 24:1-6), but later clarified that Byrd never consented after offering to retrieve the blunt, (id. at 96:9-17). On the patrol car surveillance video, Byrd stated, "don't search my car" and "I don't want you to search it." (Def. Ex. 11 at 18:54:12-18:54:23, 18:54:40-18:54:46). According to Trooper Long, Byrd expressed "nervous laughter" during this exchange, was unable to stand still, and was "dancing . . . [or] pacing back and forth." (6/30/15 Tr. 23:1-5; see Def. Ex. 11 at 18:54:40-18:54:45). Trooper Long responded to Byrd: "[Y]ou gave us permission and actually I have probable cause because you told us what's in there but, however we don't need it cause you're not on [the rental agreement], you have no expectation of privacy, alright?" (Def. Ex. 11 at 18:55:10-18:55:30).

  Trooper Martin stood with Byrd outside the vehicle as Trooper Long began searching the driver's side of the passenger compartment. (6/30/15 Tr. 24:10-13). Byrd admitted to Trooper Martin that he used cocaine earlier that day and continued nervously walking back and forth on the side of the road. (Id. at 24:13-18, 105:1-13; Def. Ex. 11 at 18:55:55-18:56:30). During the search, an off-duty trooper arrived at the scene. (6/30/15 Tr. 24:22-25; Def. Ex. 11 at 18:59:11-18:59:20). Trooper Martin began searching the trunk of the rental vehicle before Trooper Long finished searching the passenger compartment. (See Def. Ex. 11 at 18:55:40-18:59:20). In the trunk, Trooper Martin discovered "Outlaws motorcycle gang colors" and a bulletproof vest. (6/30/15 Tr. 25:4:13, 105:24-106:5; Def. Ex. 11 at 18:58:35-18:59:55). Trooper Martin explained to Byrd that he was not under arrest but that he would be detained in handcuffs for the duration of the stop. (6/30/15 Tr.

6

25:13-18, 106:6-12). Byrd then took off running and all three troopers pursued him. (Id. at 25:18-24, 106:13-20; Def. Ex. 11 at 18:59:55-19:00:00). After being subdued by the troopers, Byrd admitted that there was heroin in the rental vehicle. (Id. at 26:10-12). The troopers found heroin in a black garbage bag in the trunk of the rental vehicle, (id. at 26:17-21; Def. Ex. 11 at 19:03:40-19:04:00, 19:09:45-19:10:10), but never recovered a blunt or cocaine, (6/30/15 Tr. 83:19-21, 108:5-6; Def. Ex. 501 at 1-2).

## II. Procedural History

A federal grand jury returned a two-count indictment against Byrd charging him with manufacturing, distributing, and possessing with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and with possession of body armor as a person previously convicted of a crime of violence in violation of 18 U.S.C. § 931(a)(1). Byrd pled not guilty and promptly moved to suppress all evidence obtained subsequent to the September 17, 2014 traffic stop. The Honorable William W. Caldwell convened suppression hearings on June 30 and July 8, 2015.

In denying Byrd's motion to suppress, Judge Caldwell determined that Byrd lacked standing to challenge the search of the rental vehicle despite being the sole occupant because he had no expectation of privacy in the rental vehicle as he was not listed on the rental agreement; that Trooper Long initiated a lawful traffic stop of the vehicle; and that Trooper Long developed reasonable articulable suspicion of criminal activity to justify expanding the scope of the inquiry beyond the initial reason for the stop. See United States v. Byrd, No. 1:14-CR-321, 2015 WL 5038455, at *2-4 (M.D. Pa. Aug. 26, 2015). The Third Circuit Court of Appeals affirmed. See United States v. Byrd, 679 F. App'x 146 (3d Cir. 2017) (nonprecedential).

7

The Supreme Court granted *certiorari* and reversed.  The Court held that a person "in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver."  Byrd v. United States, 584 U.S. ___, 138 S. Ct. 1518, 1524 (2018).  The Court identified two issues to be considered on remand to the Third Circuit: (1) whether an individual who "intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief" as pertains the existence of a reasonable expectation of privacy in the rental vehicle; and (2) whether probable cause "justified the search in any event."  Id. at 1531.  The Third Circuit further remanded the case and identified a third issue for consideration: whether Byrd consented to the search.  United States v. Byrd, 742 F. App'x 587, 591-92 (3d Cir. 2018) (nonprecedential).  Due to Judge Caldwell's retirement, the matter was transferred to the undersigned.  We convened a suppression hearing on February 28, 2019.  Byrd offered an additional exhibit into the record, but the parties presented no testimony or argument.  After supplemental briefing, Byrd's motion to suppress is again ripe for disposition.

**III. Discussion**

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990).  Warrantless searches generally are presumed to be unreasonable, subject to only "a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).  These exceptions include circumstances in which officers receive consent to search, see

8

United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)), or develop probable cause that a vehicle contains evidence of a crime, see United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (citations omitted). Byrd argues that the troopers failed to obtain his consent and lacked probable cause to search the rental vehicle.[5] We begin with the issue of consent.

### A. Consent

Law enforcement may conduct a search in the absence of a warrant or probable cause if the questioned individual consents to the search. Stabile, 633 F.3d at 230 (quoting Schneckloth, 412 U.S. at 219). The government must prove that consent was "freely and voluntarily given" and not mere acquiescence to "a claim of lawful authority." United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983); Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)). Courts consider the totality of the circumstances in determining whether consent to search was voluntary. Id. at 278 (citing Schneckloth, 412 U.S. at 227). Pertinent to this analysis are the following factors: the individual's age, education, and intelligence; whether law enforcement advised the individual of his or her constitutional rights; the length and setting of the

---

[5] As noted *supra*, the Supreme Court identified a third issue to be considered on remand, *viz.*, whether a person is entitled to a reasonable expectation of privacy in a rental vehicle when he or she fraudulently uses a third-party renter to procure a rental vehicle in order to commit a crime. The government elected to abandon its position that Byrd had no reasonable expectation of privacy in the rental vehicle on this basis. (Doc. 108 at 3-4 n.1).

9

encounter; the frequency and duration of the questioning; the parties' verbal and nonverbal conduct; and any use of physical punishment. Id. (citations omitted).

It is clear from the record that Byrd did not freely and voluntarily consent to the search of the rental car. After Byrd exited the vehicle, Trooper Long repeatedly asked him for consent to search it. (6/30/15 Tr. 23:6-12, 24:1-6; Def. Ex. 11 at 18:53:02-18:53:42). Byrd offered to retrieve a blunt from the vehicle for the troopers, (6/30/15 Tr. 93:3-8), but at no point granted them consent to search. *Per contra*, Byrd unequivocally responded, "don't search my car" and "I don't want you to search it." (Def. Ex. 11 at 18:54:12-18:54:23, 18:54:40-18:54:46). Trooper Long admitted that Byrd never consented to the search after offering to retrieve the blunt from the vehicle. (6/30/15 Tr. 96:9-17).

The government contends that Byrd eventually consented to a search of the rental vehicle. (Doc. 108 at 11). Even if Byrd eventually consented, such consent is invalidated by the troopers' claim of lawful authority to search without Byrd's consent. Trooper Long informed Byrd that he was not authorized to drive the vehicle according to the rental agreement, (Def. Ex. 11 at 18:52:50-18:53:02), and explained that the troopers could therefore search the vehicle without consent or probable cause because Byrd lacked an expectation of privacy therein, (id. at 18:55:10-18:55:30). At no point on the surveillance video of the traffic stop can Byrd be heard giving clear consent to search. And regardless of whether Byrd ultimately relented and permitted the troopers to search, such permission is tainted by the troopers' claim that, under the circumstances, they could lawfully search the vehicle without Byrd's consent. The troopers failed to obtain Byrd's free and

10

voluntary consent to search. Accordingly, the warrantless search of the rental vehicle cannot be justified on grounds of consent.

**B.  Probable Cause**

Under the "automobile exception" to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if there is "probable cause to believe that the vehicle contains evidence of a crime."[6] Donahue, 764 F.3d at 299-300 (citations omitted). The nature of probable cause is an amorphous concept. See Ornelas v. United States, 517 U.S. 690, 695-96 (1996). It is "not readily, or even usefully, reduced to a neat set of legal rules." Id. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 449 U.S. 411, 418 (1981). If there is a "fair probability" that evidence of a crime or contraband would be found

---

[6] Automobile search cases often fall within two separate categories: automobile exception cases and search-incident-to-arrest cases. In Arizona v. Gant, 556 U.S. 332 (2009), the Supreme Court "narrowed the scope of the search-incident-to-arrest doctrine." United States v. Shakir, 616 F.3d 315, 318 (3d Cir. 2010). The Court held that police may search a car incident to arrest when (1) "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle" or (2) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 556 U.S. at 335, 343. The incident-to-arrest exception to the warrant requirement imposes a lower threshold for conducting a search than a showing of probable cause but limits the search to the evidence of the crime of arrest. Donahue, 764 F.3d at 299 n.6 (citations omitted); see Gant, 556 U.S. at 347. In Gant, the Court acknowledged the continued viability of the separate and distinct automobile exception to the warrant requirement. Gant, 556 U.S. at 347; see United States v. Andrew, 417 F. App'x 158, 162-63 (3d Cir. 2011) (nonprecedential) (recognizing the automobile exception's continued viability post Gant); United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011) (same) (collecting cases).

in a vehicle, then probable cause to search the vehicle exists. Donahue, 764 F.3d at 301 (quoting Gates, 462 U.S. at 238). Whether probable cause exists is an *objective* determination based on the totality of the circumstances present at the time of the search. See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005).

When an officer obtains probable cause to search a lawfully stopped vehicle, the probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982). The search may be "no broader and no narrower than a magistrate could legitimately authorize by warrant." Donahue, 764 F.3d at 300 (quoting Ross, 456 U.S. at 825). The permissible scope of this warrantless search is defined by the object sought and is limited to the places in which officers have probable cause to believe that object may be found. Ross, 456 U.S. at 825; Donahue, 764 F.3d at 300. In reaching this holding, the Supreme Court canvassed its Fourth Amendment jurisprudence and offered the following illustrative exposition:

> The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab.

Id. at 824. Thus, the nature of the object necessarily informs a court's analysis of the reasonableness of the scope of the search.

Judge Caldwell previously determined that the troopers had reasonable articulable suspicion that Byrd was engaging in criminal activity which justified extending the traffic stop. See Byrd, 2015 WL 5038455, at *4. Byrd exhibited signs of extreme nervousness and was driving a vehicle rented in another's name. Id.; (6/30/15 Tr. 15:2-6; 15:20-23, 16:6-12, 21:1-5, 101:18-102:3; Def. Ex. 7 at 2; Def. Ex. 11 at 18:28:53-18:29:30 18:32:00-18:32:35, 18:38:18-18:38:32, 18:41:30-18:42:00). The troopers learned that Byrd had an active, limited-extradition arrest warrant in New Jersey and a criminal history involving drugs. Byrd, 2015 WL 5038455, at *4; (6/30/15 Tr. 20:5-7, 20:17-19, 21:7-9, 21:14-21, 58:16-21; Def. Ex. 11 at 18:20:25-18:20:35, 18:21:40-18:22:30). Byrd also produced a nontraditional driver's license without a picture, and the troopers struggled to determine whether Byrd and his alias "James Carter" were the same person. Byrd, 2015 WL 5038455, at *4; (6/30/15 Tr. 16:14-16, 18:15-19:7, 102:24-103:4; Def. Ex. 7 at 2; Def. Ex. 11 at 18:28:30-18:28:38, 18:29:30-18:49:15). Given all of this, Trooper Long asked Byrd whether the vehicle contained anything illegal, to which Byrd eventually replied that there was a blunt in the vehicle.[7] (6/30/15 Tr. 23:6-17, 104:17-25; Def. Ex. 11 at 18:53:02-18:53:56). Byrd's

---

[7] Byrd argues that the term "blunt" is susceptible of two interpretations, noting that the term has its origins in the "Phillies Blunt Cigar," a specific (and legal) type of short-tobacco cigar. (Doc. 110 at 20). Byrd asserts that the troopers incorrectly "jumped to the conclusion" that he meant the slang version of "blunt," that is, a hollowed-out cigar filled with marijuana. (Id.) Notably, Byrd never claims that he was referring to a standard Phillies Blunt Cigar. (See id. at 20-21). Byrd indicated the presence of a blunt shortly after Trooper Long asked if there was anything illegal in the rental vehicle. (6/30/15 Tr. 23:6-17; Def. Ex. 11 at 18:53:02-18:53:56). The existence of probable cause is an objective determination, see Williams, 413 F.3d at 353 n.6, and under the circumstances, the troopers reasonably understood Byrd to mean the slang term for "blunt."

13

admission to the presence of a blunt and his offer to retrieve it transformed the troopers' reasonable suspicion into probable cause that the rental vehicle contained evidence of criminal activity.[8]

Byrd contends that the troopers only had probable cause to believe that he possessed drugs for personal use in the vehicle's passenger compartment and, therefore, the permissible scope of the search was necessarily limited to that portion of the vehicle. (Doc. 110 at 23-25). The Third Circuit has not yet addressed this theory. Byrd, 742 F. App'x at 591 & n.5. On appeal, the panel identified a nonexhaustive list of examples from two ostensibly competing lines of cases to guide our inquiry on remand. See id. We have carefully reviewed these decisions and canvassed other relevant federal appellate court opinions.

The Sixth Circuit's decision on the issue in United States v. Burnett, 791 F.2d 64 (6th Cir. 1986), is particularly instructive. In Burnett, an officer noticed a bag containing two ounces of marijuana in plain view on the car's floorboard and later discovered cocaine in a champagne box while searching the trunk. Id. at 65-66. The defendant raised an argument identical to Byrd's—that the officer lacked probable cause to search the trunk based solely on a quantity of marijuana consonant with personal use rather than dealing. Id. at 67. The Sixth Circuit

---

[8] Trooper Long testified that Byrd's tongue was green, which Trooper Long claimed was evidence of smoking marijuana. (6/30/15 Tr. 23:18-20). The government cites to no authority suggesting that the color of a person's tongue is indicative of marijuana consumption, (see Doc. 108), and the court's independent survey of caselaw revealed none. Byrd's admission to cocaine consumption is also excluded from our probable cause analysis as the troopers had already begun their search of the rental vehicle at the time of this admission. (See 6/30/15 Tr. 24:13-18, 105:1-7).

14

rejected this argument, reasoning that "neither the casual user nor the dealer fits any precise description or category," probable cause is not defined quantitatively, and requiring police to make such a quantitative judgment in the moment is unreasonably burdensome.  Id.  The court held that the officer's discovery of marijuana consistent with personal use in the passenger compartment justified a search of the trunk and its contents.  Id. at 67-68.  We find the Sixth Circuit's *ratio decidendi* persuasive and note that other circuit courts have likewise rejected a personal use delimitation.  See, e.g., United States v. Turner, 119 F.3d 18, 20 (D.C. Cir. 1997); United States v. Loucks, 806 F.2d 208, 211 (10th Cir. 1986).

Our rejection of Byrd's personal use argument also comports with the Third Circuit's broad interpretation of Ross in United States v. Rickus, 737 F.2d 360 (3d Cir. 1984).  In Rickus, officers developed probable cause that the vehicle's occupants were engaged in criminal activity (burglary) based on items visible in the passenger compartment, the officers' interactions with the occupants, and the presence of a bullet-proof vest worn by one occupant.  Id. at 366-67.  The Third Circuit rejected the district court's conclusion that "probable cause to believe the passenger area of an automobile contains burglar tools does not alone justify a search of its trunk," id. at 367, and concluded that the trunk was subject to search because it was capable of concealing evidence of burglary, id. (quoting Ross, 456 U.S. at 825); see also United States v. Schecter, 717 F.2d 864, 869 (3d Cir. 1983), abrogated in part on other grounds by Arizona v. Gant, 556 U.S. 332 (2009).  The court further emphasized that officers who establish probable cause that the passenger compartment contains contraband do not need an "independent reason to believe that the contraband for

15

which they are searching is located specifically in the trunk." See Rickus, 737 F.2d at 367 (citing Schecter, 717 F.2d at 869). In this case, the trunk of Byrd's rental vehicle was capable of concealing evidence of drug use, including the blunt.

Relying on certain of the cases collected in the Third Circuit's opinion, Byrd asseverates that his admission to having a blunt in the vehicle could not provide probable cause to search the trunk unless officers discovered corroborative physical evidence of drug use in the passenger compartment. (Doc. 110 at 25-27). We disagree. The genesis of the automobile search in these cases was the smell of raw and burnt marijuana. Expressing concern with the inherent infirmities of the human sense of smell, the Tenth Circuit has required that an officer who detects an odor of marijuana emanating from a vehicle's passenger compartment must first find corroborating evidence of drug use or dealing to establish probable cause to search the remainder of the vehicle, including the trunk. United States v. Parker, 72 F.3d 1444, 1450 (10th Cir. 1995) (citing United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir. 1993); United States v. Ashby, 864 F.2d 690, 692 (10th Cir. 1988); Loucks, 806 F.2d at 210-11). The court observed that in nearly all cases where a corroboration requirement was imposed, "the search itself established the validity of the smell." Nielsen, 9 F.3d at 1491 & n.5. We read the Tenth Circuit's decisions not as limiting the broad scope of a permissible automobile search under Ross but doubting, as a threshold matter, whether the smell of marijuana is a sufficiently

16

reliable indicator of probable cause to believe that evidence of criminal activity may be found in the vehicle.[9]

The remaining cases identified by the Third Circuit are in accord with our understanding of Ross. For example, in United States v. McSween, 53 F.3d 684 (5th Cir. 1995), the Fifth Circuit applied Ross to hold that the smell of marijuana emanating from the passenger compartment justified the search of "every part of the vehicle and its contents" that might conceal drugs, even under the hood. McSween, 53 F.3d at 687 (quoting Ross, 456 U.S. at 825). Similarly, in United States v. Turner, 119 F.3d 18 (D.C. Cir. 1997), the D.C. Circuit, also applying Ross, concluded that evidence of personal drug use in the passenger compartment—the smell of burnt marijuana combined with observation of torn pieces of cigar tobacco and a bag of marijuana—established probable cause to believe that additional contraband would be found elsewhere in the vehicle, including the trunk. Turner, 119 F.3d at 20, 23 (quoting Ross, 456 U.S. at 825). And in United States v. Winters, 221 F.3d 1039 (8th Cir. 2000), the Eighth Circuit held that the smell of raw marijuana in the passenger compartment created probable cause to search the entire vehicle; that decision is entirely consistent not only with Ross but with its application in McSween and Turner. See Winters, 221 F.3d at 1041-42. None of these cases support the narrowing of Ross advanced by Byrd.

---

[9] We also note that the Third Circuit has held that "the smell of marijuana alone . . . may establish not merely reasonable suspicion, but probable cause." United States v. Green, 897 F.3d 173, 186 (3d Cir. 2018) (alteration in original) (citation omitted).

Byrd's statements indicating that the blunt was likely in the passenger compartment in no way limited the permissible scope of the troopers' search of the vehicle. The troopers were not required to have an "independent reason" to believe that the blunt for which they were searching was located elsewhere in the vehicle, including in the trunk. See Rickus, 737 F.2d at 367. And we decline to impose a corroboration requirement in this case; the troopers relied on Byrd's own admission to the presence of marijuana—not human detection of its odor—to establish probable cause to search. We conclude that Troopers Long and Martin had probable cause to search Byrd's entire rental vehicle.

### C. Good Faith Exception

Assuming *arguendo* that Troopers Long and Martin lacked probable cause to search the trunk of Byrd's rental vehicle, their conduct falls squarely within the good faith exception to the exclusionary rule. Evidence directly derived from an unlawful search or seizure is fruit of the illegality and demands exclusion. Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999). The exclusion of evidence is warranted when meaningful deterrence is "appreciable" and "outweigh[s] the heavy social costs of suppressing reliable, probative evidence." United States v. Katzin, 769 F.3d 163, 181 (3d Cir. 2014) (*en banc*) (quoting United States v. Leon, 468 U.S. 897, 909 (1984)) (citing Davis v. United States, 564 U.S. 229, 240 (2011)). Any evidence obtained by an officer who effects a search "in reasonable reliance on binding precedent is not subject to the exclusionary rule." United States v. Vasquez-Algarin, 821 F.3d 467, 483 (3d Cir. 2016) (quoting Davis, 564 U.S. at 241).

Byrd was not a signatory to the rental agreement for the vehicle. Under then-existing Third Circuit precedent, "the driver of a rental car who ha[d] been [l]ent the car by the renter, but who [was] not listed on the rental agreement as an authorized driver, lack[ed] a legitimate expectation of privacy in the car" absent extraordinary circumstances suggesting otherwise. United States v. Kennedy, 638 F.3d 159, 165 (3d Cir. 2011), abrogated by Byrd, 138 S. Ct. 1518. At the time of the search, Byrd was informed that he had no expectation of privacy in the vehicle because he was not listed on the rental agreement and thus the troopers could search the vehicle without consent or probable cause. (Def. Ex. 11 at 18:52:50-53:02, 18:55:10-30). Moreover, because Byrd had no personal contact with the rental company and was not the spouse of the lawful renter, the extraordinary circumstances exception outlined in Kennedy was inapplicable. See Kennedy, 638 F.3d at 168. Troopers Long and Martin acted reasonably in relying on then-binding precedent outlined in Kennedy. Accordingly, the evidence they obtained from Byrd's rental vehicle is not subject to the exclusionary rule.

## IV. Conclusion

The court will deny Byrd's motion (Doc. 28) to suppress evidence. An appropriate order shall issue.

                                            /S/ CHRISTOPHER C. CONNER
                                            Christopher C. Conner, Chief Judge
                                            United States District Court
                                            Middle District of Pennsylvania

Dated:    June 6, 2019